Filed 8/12/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re Marriage of MANISHKUMAR and PRIYANKA ANKOLA. | H045092, H045203, H046567 (Santa Clara County Super. Ct. No. 115-FL173072) |
| MANISHKUMAR ANKOLA, Appellant, v. PRIYANKA ANKOLA, Respondent. | |

Petitioner Manishkumar Ankola (Manish)[1] and respondent Priyanka Ankola (Priyanka) met in August 2013, were married in June 2014, but ultimately the marriage was dissolved in September 2018. In these three appeals, Manish challenges certain orders entered by the trial court during the dissolution proceedings, as follows:

1.      In H045092, Manish appeals from the trial court's August 15, 2017 order granting respondent Priyanka's request for a domestic violence restraining order (DVRO) pursuant to Family Code section 6344,[2] arguing that the order is not supported by substantial evidence. As discussed below, we conclude that the DVRO was supported by substantial evidence and will therefore affirm the order.

---

[1] In his briefing, Mr. Ankola refers to himself by the abbreviated version of his first name, so we will do the same.

[2] Unspecified statutory references are to the Family Code.

2.      In H045203, Manish appeals from an October 5, 2017 order rescinding a prior award of attorney fees, entered on March 8, 2017, in his favor,[3] arguing that the trial court lacked jurisdiction to reconsider the March 8, 2017 order or, alternatively, that the October 5, 2017 order rescinding it constituted an "unauthorized sanction" against him. We agree that the trial court erred in rescinding the prior order, but for reasons different than those advanced by Manish. Accordingly, we will reverse the October 5, 2017 order rescinding the prior award of attorney fees to Manish.

3.      In H046567, Manish appeals from the judgment of dissolution, filed on November 29, 2018, arguing the trial court employed the incorrect standard of proof when it denied his petition for nullity by order dated October 31, 2016.[4] As we explain, the trial court utilized the appropriate standard of proof in that hearing and we will therefore affirm the order denying Manish's petition for nullity as well as the judgment of dissolution.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

In an effort to impose clarity on an otherwise confusing record of what has transpired below, we first briefly describe the procedural history leading up to each of the three appeals addressed herein. Detailed recitations of the evidence presented in the relevant hearings are provided in conjunction with the discussion of the issues raised in those individual appeals.

On December 15, 2015, Manish filed a petition for nullity of his marriage to Priyanka, based on fraud. Priyanka's response denied the allegations of Manish's

---

[3] The notice of appeal in H045203 indicates that Manish is appealing an order denying his motion to hold Priyanka in contempt and an order denying Manish's application to sell property. However, Manish does not raise any arguments in his briefs relating to these orders and we consider the issues waived. "Courts will ordinarily treat the appellant's failure to raise an issue in his or her opening brief as a waiver of that challenge." (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685 (*Paulus*).)

[4] Manish does not otherwise challenge the judgment of dissolution in his briefing and we consider the issue waived. (*Paulus*, *supra*, 139 Cal.App.4th at p. 685.)

petition, and requested dissolution of the marriage due to irreconcilable differences.  The parties engaged in a series of acrimonious court proceedings over the next several years, leading to multiple appeals, three of which are addressed herein.

A.     *Procedural history relating to H045092 and H045203*

On July 14, 2016, Priyanka filed a request for a domestic violence restraining order (DVRO) against Manish.  Priyanka's request for a DVRO proceeded to a bifurcated trial on September 7, 2016, along with Manish's petition for nullification.  The trial court denied Manish's petition for nullification and Priyanka's request for a DVRO, finding that the parties had failed to meet their respective burdens of proof.[5]  The court reserved Manish's request for attorney fees in connection with Priyanka's unsuccessful application for a DVRO.  Following a hearing, the court issued an order on March 8, 2017, awarding Manish $10,000 in attorney fees as "the prevailing party in the DVRO action."  The order provided that the fees were "[d]ue in full, on or before []: April 13, 2017."

In February 2017, Priyanka filed a new request for a DVRO against Manish based on facts which had arisen since the September 2016 hearing.  After a hearing, the trial court granted Priyanka's request and, on August 15, 2017, issued a DVRO against Manish with a five-year duration (the 2017 DVRO).  On August 31, 2017, Manish appealed (H045092) from the 2017 DVRO.  Manish also purported to appeal from "[a]ny attorney's fees award against [Manish] related to" the 2017 DVRO, but at the time he filed the notice of appeal in H045092, Priyanka's request for an award of attorney fees was still pending.

---

[5] On December 13, 2016, Manish filed a notice of appeal from the order denying his petition to nullify the marriage (H045335), but because that notice was lost or misplaced by the superior court, it was not lodged in this court until December 14, 2017. In April 2018, we issued an order to show cause why the appeal should not be dismissed as taken from a nonappealable order and dismissed the appeal for that reason by written order dated June 1, 2018.  Manish's petition for review of that dismissal was denied by the California Supreme Court on August 8, 2018.

Priyanka's request for attorney fees was heard on September 11, 2017, and in an order dated October 5, 2017, the trial court: (1) awarded $10,562.50 in attorney fees to Priyanka; and (2) rescinded its March 8, 2017 order awarding $10,000 in attorney fees to Manish. On October 12, 2017, Manish appealed (H045203) from the October 5, 2017 order in its entirety as well as an "[o]rder entered September 21, 2017, denying sale of my separate property home."[6] On December 11, 2017, we ordered that the appeals in H045092 and H045203 be considered together for purposes of briefing, oral argument and disposition.

### B.    Procedural history relating to H046567

As discussed above, the trial court denied Manish's petition for nullity following a contested hearing on September 7, 2016, and we dismissed Manish's appeal from that nonappealable order in June 2018. On September 27, 2018, the trial court proceeded to hear Priyanka's petition for dissolution. After bifurcating the issue of marital status, the trial court found "good cause to grant dissolution of the status of the marriage only." On December 3, 2018, Manish filed a notice of appeal (H046567) from the judgment of dissolution entered on November 29, 2018,[7] specifically challenging the September 2016 order denying his petition to nullify the marriage. On May 21, 2020, we ordered that the appeal in H046567 be considered with the appeals in H045092 and H045203 for purposes of oral argument and disposition.

## II.    DISCUSSION

### A.    Order to show cause

Before turning to the merits of the three appeals, we must address the June 1, 2018 order in which we directed Manish to show cause why his appeal in H045092 from "any attorney's fees award" should not be dismissed as premature. Manish filed a response to our order to show cause on June 15, 2018, along with a request for leave to file an

---

[6] See footnote 3, *ante*.

[7] The judgment specifies that the date of dissolution is September 27, 2018.

amended notice of appeal in H045092. We denied the request to file an amended notice of appeal by written order and indicated that the order to show cause "shall be considered with the merits of the appeals in Case Nos. H045092 and H045203."

Although Manish's notice of appeal from the award of attorney fees in H045092 was premature, we have discretion to treat it "as filed immediately after entry of" the order, which would be timely. (Cal. Rules of Court, rule 8.104(d)(2).) In exercising our discretion, we liberally construe a premature notice of appeal in favor of its sufficiency. (*Marcotte v. Municipal Court* (1976) 64 Cal.App.3d 235, 239.) It is reasonably clear from the notice of appeal that Manish intended to challenge the trial court's impending decision to award attorney fees to Priyanka, and it does not appear that she was misled or prejudiced by Manish's reference to "[a]ny attorney's fees award against [Manish] related to" the 2017 DVRO instead of the written order entered on October 5, 2017. We will therefore treat the premature notice of appeal of attorney fees in H045092 as being filed immediately after the written order that was entered on October 5, 2017. (Cal. Rules of Court, rule 8.104(d)(2).)

### B. H045092—2017 order granting Priyanka's DVRO petition

#### 1. Petition and hearing

In her February 22, 2017 request for a DVRO, Priyanka alleged that, despite her many requests, Manish continued to make unwanted contact with her, in e-mails and by calling her phone repeatedly from September 2016 through February 2017. Priyanka further alleged that "[Manish] is obsessed with me and if he can't have me back he threatens to deport me, he embarrasses me by disclosing personal information including sexual intimate information to my family and friends." Priyanka alleged that on December 30, 2016, Manish was "stalking me at my apartment building" and she discovered that he "had secretly moved into the apartment adjacent" to hers.

5

Evidence was presented on Priyanka's request for a DVRO at separate hearings on April 26, 2017 and June 19, 2017.[8]

### a. *Priyanka's evidence*

City of Mountain View Police Officer Ricky Valenzuela testified that he was dispatched to an apartment complex around 11:00 a.m. on December 30, 2016, in response to a report of a domestic disturbance. Upon his arrival, he spoke to Priyanka, the reporting party, who told him that her husband had just moved next door to her. Priyanka told Valenzuela "about her past" history with Manish. However, Priyanka said that Manish did not threaten or touch her that day.

Valenzuela then went to speak to Manish in his apartment. Manish told him that he had moved to that apartment "a few days earlier" and had signed a one-month lease. Manish said he knew that Priyanka was "living next door" and that he moved to this place because he wanted his son to attend a local public high school. With Manish's consent, Valenzuela looked around and observed that the only items in the one-bedroom apartment were a lawn chair, and some blankets and pillows in the living room. The bedroom itself was empty.

While Valenzuela was still at the apartment complex conducting his investigation, Priyanka showed him an e-mail that Manish had just sent her, which showed a time stamp of 12:06 p.m. In that e-mail, Manish wrote he could not find an apartment in Cupertino at a "reasonable price," the "only [apartment] I found here" was the apartment "opposite you," but "[i]t has nothing to do with you." Valenzuela contacted the judge responsible for issuing emergency protective restraining orders, but the judge did not issue a restraining order. Valenzuela's report on the incident, which included the e-mail Manish sent to Priyanka that day, was admitted into evidence.

---

[8] A third hearing was held on May 19, 2017, to discuss the terms of a possible settlement, but no agreement could be reached. No evidence was presented at this hearing.

Priyanka testified that she received an e-mail from Manish on December 29, 2016, in which he informed her that he was going to move to Cupertino. The next day, she was taking her trash to the dumpster in the garage at her apartment complex when she saw Manish standing near a car. Manish tried to hide, but once he realized she had seen him, he came toward her.

Priyanka ran to her apartment, with Manish following. She pulled out her phone and began taking a video of him, telling him to go away. Manish told her he lived in the complex, in the apartment directly across from hers. Priyanka said she was going to call the police, and Manish asked her not to do so, saying he wanted to talk to her. He told her that he had moved in so that his son could attend a public school in the area.

Priyanka called the police and met with Valenzuela when he responded. Priyanka moved out of her apartment that evening, though she admitted she had already planned to move out before she discovered that Manish had rented an apartment there.

Priyanka confirmed that she had previously asked Manish, either personally or through counsel, not to contact her. Priyanka authenticated and introduced into evidence three e-mails, dated May 18, 2016, September 23, 2016, and November 28, 2016, reflecting those requests. Despite this, Manish continued to contact her, sending her e-mails.

On December 8, 2016, Manish sent Priyanka an e-mail informing her that he "had sent a complaint to the immigration officials."

### b.      *Manish's evidence*

Manish testified that he was currently unemployed and was laid off in March 2017. He complained that this was "the third restraining order [request] [Priyanka] has filed against me based on frivolous accusations" and, in his mind, "all of this is in order to support her green card petition."

Manish traveled to India twice in October and November of 2016, staying between 40 and 50 days, because his father was gravely ill and then died. During the first week he

7

was in India, he kept Priyanka "informed by e-mail" about his father's health because "my dad was very close to everybody in her family." Manish admitted he was trying to "reconnect . . . with her" because his father "wanted us to be happy together."

When Manish returned to the United States on December 4, 2016, he discovered that he would be laid off. Because he was losing his job, Manish would probably not be able to afford to send his son to a private high school in the fall, so he needed to move to an address within the district boundaries of a highly-rated public high school.

Manish admitted that he rented an apartment right across from the one in which Priyanka lived, but said he did not know she still lived there. He knew she had lived there previously. Manish knew that this apartment complex in Mountain View was within the boundaries for one of the two public schools his son wished to attend. The other school was in Cupertino, but Manish could not find an apartment in that city "at a reasonable cost," although he did submit rental applications to "three or four apartment complex[es]." However, the complex in Mountain View had month-to-month rentals, which he found desirable.

The court asked Manish if "[Priyanka]'s former residence at that complex played zero role in your selection" and Manish answered "yes and no." He did not expect Priyanka to be there, and if he "was stalking her" he would have rented the apartment two months prior. Because Manish knew the apartment was within the school boundaries and allowed month-to-month tenancies, he made no effort to look for other rentals in Mountain View.

Manish said that, when he inquired about the Mountain View apartment, he was informed there was only one vacancy. Though his application was approved on December 15, he did not pick up the keys until December 27, 2016. Manish put down a security deposit for the apartment on December 4, 2016. After confirming that this was the day on which Manish returned from India, the trial court asked if he put down a

8

deposit for this apartment before making inquiries about other apartments. Manish responded that he also put down a deposit for an apartment in Cupertino.

On December 30, 2016, Manish was at the apartment complex in Mountain View to see if he could cancel his lease because he had "found an apartment in Cupertino." As he was going to his apartment to retrieve his belongings, he saw Priyanka and unsuccessfully tried to hide from her. When she saw him, she "was almost hysterical," screaming and yelling at him, saying she would call the police. Manish begged her not to, saying he was "not here for her." He denied knowing that Priyanka still lived in the complex at any point in time before running into her on December 30, 2016. After speaking to the police that day, Manish did not return to the apartment until January 30, 2017, when he dropped off the keys. He denied seeing or trying to contact Priyanka at any time since December 30, 2016.

On cross-examination, Manish admitted that he sent Priyanka an e-mail in November 2016 "reminding her that her green card was going to expire." He also sent her an e-mail informing her that he was sending a complaint letter to the federal immigration service and admitted that he did send such a letter because he "sponsor[ed] her green card." Manish continued that "the whole marriage was [a] fraud and it was only for immigration purposes." Manish also admitted sending a letter to Priyanka's employer, with a number of documents attached, in which he claimed Priyanka married him only for a green card and that she falsified her résumé.

Manish accused Priyanka of "perpetrat[ing] violence against" him in July 2015, but he did not call the police or seek a restraining order against her. He regrets not doing so but was trying to save his marriage at the time.

### c. *Trial court's ruling*

After the parties submitted, the trial court granted Priyanka's request for a DVRO for a five-year period. In explaining its decision, the trial court stated that the "central fact at [*sic*] dispute in this [DVRO] hearing" is whether Manish moved into an apartment

9

"directly next door" to Priyanka's apartment knowing that she still lived there. The trial court found Manish's testimony was not credible and it was "convinced that [Manish] has come into this courtroom and lied repeatedly on significant points." Accordingly, the court was convinced that Manish knew Priyanka was still living in the apartment complex when he signed the lease, and it was "trouble[d] . . . that any person would come into this court and lie under oath." The trial court believed that Manish "was hoping to reestablish communication and a relationship" with Priyanka.

### 2. Legal principles and analysis

#### a. Relevant legal principles and standard of review

The Domestic Violence Protective Act (DVPA) permits a court, upon a showing of "reasonable proof of a past act or acts of abuse" (§ 6300, subd. (a)), to issue a protective order restraining any person from contact, for the purpose of preventing a recurrence of domestic violence. (*Ibid*.) Under the DVPA, " 'abuse' means any of the following: [¶] (1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) *To engage in any behavior that has been or could be enjoined pursuant to Section 6320*." (§ 6203, subd. (a), italics added; see *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334.) The kinds of behavior which may be enjoined pursuant to section 6320 include "stalking, threatening, . . . harassing, telephoning, . . . contacting, either directly or indirectly, by mail or otherwise, . . . or disturbing the peace of the other party." (*Id*., subd. (a); see *Nakamura*, *supra*, at p. 334.)

Because "a trial court has broad discretion in determining whether to grant a petition for a restraining order under [the DVPA]," we review the trial court's decision to issue such a restraining order for an abuse of discretion. (*In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 702 (*Marriage of Fregoso*).) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When

10

two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.) When reviewing a trial court's factual findings for substantial evidence we accept as true all evidence tending to establish the correctness of the trial court's findings, resolving every conflict in the evidence in favor of the judgment. (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1143.) "Under the substantial evidence test, the pertinent inquiry is whether substantial evidence supports the court's finding—not whether a contrary finding might have been made." (*Marriage of Fregoso*, *supra*, at p. 702.) "The testimony of one witness, even that of a party, may constitute substantial evidence." (*Id*. at p. 703.)

### b. Analysis

Manish argues the trial court erred in granting Priyanka's request for a DVRO because there was not substantial evidence he engaged in conduct which qualified as domestic violence under the DVPA. He focuses on the fact that there were no allegations or evidence showing he physically abused or threatened Priyanka on December 30, 2016, or that his "conduct destroyed Priyanka's mental or emotional calm." We disagree.

The DVPA is not limited, as Manish seems to suggest, to circumstances involving physical harm, threats of physical harm, or conduct resulting in severe emotional distress to the person seeking the restraining order. Section 6320 lists a wide range of conduct that may be enjoined, including stalking, which was one of the principal complaints Priyanka made. The trial court even noted that "the central fact at [*sic*] dispute in this [DVRO] hearing" is whether Manish was stalking Priyanka by moving into an apartment "directly next door."

In his briefing, Manish points out that Priyanka offered no evidence to establish that he "knew she was still residing at the apartment" or evidence "disputing that the apartment . . . was zoned for" one of the public high schools Manish was considering for his son. As noted above, though, when we engage in a review under the substantial

11

evidence standard, it does not matter whether some of the uncontroverted evidence presented might have supported a contrary result below. (*Marriage of Fregoso*, *supra*, 5 Cal.App.5th at p. 702.) Having heard the testimony of Valenzuela, Priyanka, and Manish about the incident on December 30, 2016, the trial court determined that Manish engaged in stalking by moving into the Mountain View apartment knowing that Priyanka still occupied the apartment immediately across from his. The trial court rejected Manish's testimony that he was unaware Priyanka still lived in the complex or that his sole motivation was to secure an address that would allow his son to attend a local public high school, finding that Manish "lied repeatedly on significant points."

Priyanka had also requested a DVRO due to Manish's repeated failure to respect her wishes that he not contact her. At the hearings, Priyanka authenticated several e-mails—either from herself or her attorney—requesting that Manish no longer attempt to communicate with her or her family. As Priyanka testified, Manish simply ignored those requests and continued to call and send her e-mails. There was substantial evidence that Manish engaged in this conduct, which would constitute harassment, unwanted contact, and disturbing the peace under section 6320.

Accordingly, there was substantial evidence to support the issuance of the DVRO based on Priyanka's allegations of stalking and unwanted contact and the trial court did not abuse its discretion in doing so.

### C. *H045203—Order rescinding award of attorney fees to Manish*

#### 1. *Relevant facts and hearings*

On March 8, 2017, the trial court awarded Manish attorney fees in the amount of $10,000 under section 6344 as he was the prevailing party on Priyanka's previous request for a DVRO which was heard and denied on September 7, 2016. The order required that the fees were to be paid in full on or before April 13, 2017, but it is undisputed that Priyanka made no payments to Manish pursuant to this order.

12

On July 20, 2017, Priyanka filed a request for an order awarding her $10,000 in attorney fees and costs as the prevailing party under section 6344 and asked that any award "be offset against [Manish]'s attorney's fee award in the amount of $10,000." The hearing on Priyanka's request was noticed for August 17, 2017.

On August 10, 2017, the parties appeared for a hearing on Manish's order to show cause (OSC) why Priyanka should not be found in contempt for failing to pay the attorney fees awarded to Manish in the March 8, 2017 order.[9] The trial court suggested that the hearing on Manish's OSC be continued so that it could be heard in conjunction with Priyanka's request for attorney fees. The trial court stated that it was not inclined to find Priyanka in contempt for failing to pay Manish attorney fees, as it was "just about ready to make an award to [Priyanka]—when we get to [the continued hearing]—that would exceed the $10,000 of attorneys' fees to [Manish]." Manish's counsel noted that because there was currently no order awarding Priyanka attorney fees, there could be no offset against the award of fees to Manish. The trial court responded that it would "solve that problem" by staying Priyanka's "obligation to pay the initial $10,000 attorney fee award until I hear [Priyanka's]" request for attorney fees.

At the continued hearing, Manish's counsel objected that Priyanka's counsel had not provided billing statements to support her request for attorney fees.[10] The trial court directed Priyanka's counsel to provide billing statements but further noted that, at the

---

[9] Neither party included Manish's request for an OSC in their respective appendices, but according to the register of actions Manish filed it on June 23, 2017, just three days after Priyanka filed her request for attorney fees.

[10] Manish argued in his opening brief that the trial court erred in awarding attorney fees because Priyanka's attorney did not provide these billing statements. Having subsequently discovered that his trial counsel did timely receive billing statements from Priyanka's attorney, Manish withdrew this argument in his reply brief, and we will not address it further. In that same brief, Manish now argues for the first time that the trial court abused its discretion in awarding attorney fees to Priyanka under section 6344 because it failed to evaluate Manish's ability to pay. We find no good cause to consider this new argument. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)

13

previous hearing, it had expressed its belief that Manish's OSC was "frivolous." The trial court "urge[d] the parties to talk" because Priyanka's counsel is "willing to do a walkaway with an offset of the prior award. [¶] And his fees for this DVRO seems to me to make a lot of sense. But it's up to you. If you want to litigate it further, we can litigate it further." Manish's counsel expressed a desire to "go ahead with the [OSC]," and the trial court continued the matters to September 11, 2017.

At the September 11 hearing, Manish's counsel asked that the court take into consideration the fact that Manish was unemployed and that the court had previously denied two "frivolous" DVRO requests made by Priyanka. The trial court responded that it "recall[ed] the first one that [Priyanka] filed. . . . I'm sorry, in retrospect, [that] I denied it." The trial court awarded $10,562.50 in attorney fees to Priyanka.

The court then turned to Manish's OSC. After noting that it had previously stayed the March 8, 2017 attorney fees order, the trial court said that it was now "wiping that order out." Manish's counsel responded, "Your Honor, if you have already made up your mind . . . then what can I say?" When Manish's counsel cautioned that the trial court's rulings would "just lead to more appeals," the trial court replied, "Your client should have considered all of that before he got on the witness stand and gave untruthful testimony."

Manish challenges the order rescinding the March 8, 2017 award of attorney fees. He argues that, because Priyanka did not appeal from that order and the time for her to do so had expired, the trial court no longer had jurisdiction to reconsider the order, let alone rescind it. Alternatively, Manish contends the rescission order was an "unauthorized sanction" for his refusal to withdraw his OSC seeking to hold Priyanka in contempt for failing to pay attorney fees.

We agree that the trial court erred in rescinding the March 8, 2017 order, but not because the trial court lacked jurisdiction to reconsider it. The trial court rescinded the order based on new evidence, rather than the evidence presented at the original

14

proceeding. By so doing, the court in effect improperly granted a new trial, a result which lies outside its inherent powers. Accordingly, we need not reach the jurisdictional question or the alternative argument that rescinding the order was an unauthorized sanction.

2. *Applicable legal standards and analysis*

In *Le Francois v. Goel* (2005) 35 Cal.4th 1094, the California Supreme Court held that a trial court has inherent authority to reconsider "its prior *interim* rulings on its own motion." (*Id*. at p. 1105, italics added.) *In re Marriage of Barthold* (2008) 158 Cal.App.4th 1301 (*Barthold*) concluded that the rationale of *Le Francois* could properly be extended to final orders as well. (*Id*. at p. 1312.) In a footnote, the *Barthold* court was careful to point out that it was not presented with, nor did it decide, "the issue whether a trial court can reconsider an appealable order on its own motion after the time to appeal from that order has expired." (*Id*. at p. 1313, fn. 9.)

However, the *Barthold* court also made clear that, "in order to grant reconsideration on its own motion, the trial court must conclude that its earlier ruling was wrong, and change that ruling *based on the evidence originally submitted*." (*Barthold*, *supra*, 158 Cal.App.4th at p. 1314.) Where a trial court "expressly reject[s] as unreliable or inaccurate evidence adduced at the first trial," the trial court is *not* reconsidering its prior order, but is instead retrying issues of fact, i.e., granting a new trial. (*In re Marriage of Herr* (2009) 174 Cal.App.4th 1463, 1470.) "[I]n contrast to grants of reconsideration, courts have no *inherent* power to grant a new trial: '[t]he right to a new trial is purely statutory . . . .' " (*Id*. at p. 1471.) "The power of the trial court to grant a new trial may be exercised only by following the statutory procedure and is conditioned upon the timely filing of a motion for new trial." (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 899.) A trial court may not order a new trial sua sponte. (*Ibid*.)

In this case, the trial court did not change its ruling based on the evidence originally submitted at the hearing on Manish's request for an order of attorney fees.

15

Instead, it rescinded that prior order because Manish presented "untruthful testimony" at the hearing on the 2017 DVRO and it was now "sorry" it denied Priyanka's previous DVRO request. This was not reconsideration, but instead a new trial of the issue which was then summarily decided against Manish. As the trial court lacked the power to sua sponte grant a new trial, we will reverse the October 5, 2017 order rescinding the award of attorney fees to Manish.

### D. H046567—Order denying the petition for nullity

The trial court held a contested hearing on Manish's petition for nullity on September 7, 2016, and the order denying that petition was entered October 31, 2016.[11]

#### 1. Evidence presented at contested hearing

##### a. Priyanka's testimony

Priyanka testified she first met Manish during a hiking trip in August 2013 and they began dating sometime the next month. At first, the relationship was "more . . . Manish . . . trying to help me out" with finding employment in the pharmaceutical industry. Priyanka had resigned from her previous job in August 2013 because she "was not liking the work and . . . was feeling very homesick." She and Manish talked a lot "about our personal lives and . . . about our past." Priyanka felt he was "really a good listener and [was] trying to be a really good friend to me." She admitted sending Manish an e-mail on August 29, 2013, attaching her résumé and saying it would be "problematic" for her to remain in the United States without a "project" under her work visa. In a "P.S." to that e-mail, she asked for assistance "finding a bakra (citizen) who is willing to marry me :-))."[12]

---

[11] See footnote 5, *ante*.

[12] Priyanka testified that, in this context, she used the word "bakra" to mean "a scapegoat." There was no testimony regarding her use of the emoji ":-))" at the end of her postscript.

16

In early October 2013, Manish asked Priyanka to meet him at a fast-casual restaurant for breakfast. To her surprise, Manish had brought flowers and a ring to the restaurant, where he proposed to her. Priyanka did not accept his proposal because it was "too soon" for her. Priyanka returned to India at some point thereafter.

In November 2013, Manish travelled to India, and in front of Priyanka's parents, he again proposed to her. This time, she accepted, although she was "kind of guarded because [she] didn't know him completely." Priyanka said she loved him but was cautious as "he might change his mind or . . . there's something else in his mind." Priyanka also had concerns because Manish was 10 years older than her and he had two children from a prior marriage.

Priyanka remained in India until June 5, 2014, but she and Manish spoke often via video, as well as through text messages and e-mails. Manish obtained a fiancée visa for her, which required that they be married within three months. After she returned from India, Priyanka and Manish were married on June 12, 2014. Priyanka believes that Manish applied for her green card around June 25 or June 26, 2014.

Sometime in early August 2014, Manish began telling Priyanka that if she did not do what he wanted her to do, he would "do something with [her] green card." He described himself as Priyanka's "savior" from a "miserable life in India," telling her to "cook and clean" and that she could not have friends. Priyanka told Manish that she married him for a "peaceful, stable life," not "for the green card." If he could not give her that peace, she told him she would rather annul the marriage, even though she did not yet have a green card. Priyanka did search online for information about annulments around that time but did not proceed further as she felt maybe it was not the right time as she was "very disturbed."

During their honeymoon in late August, Priyanka got into a "squabble" with Manish because he kept her cell phone and iPad in the hotel room safe the whole day when she wanted to respond to an e-mail from a pharmaceutical company about a job.

17

Priyanka denied that she began throwing things around the room, as Manish claimed, but she did contact the front desk to help her open the safe.

In early October 2014, Priyanka and Manish were interviewed by an immigration officer in connection with her application for a green card. Priyanka said that the officer asked about whether they were living together and whether Priyanka was covered by Manish's health insurance. They were not "intensely questioned about the relationship" by the officer.

Priyanka recalled having "three major fights" during their marriage. The first was when she briefly considered annulment in early August 2014. The second was in January or February 2015, when Manish started asking her to contribute her entire income towards his own expenses. The third was in July 2015 when they got into an argument and Priyanka both slapped and pushed Manish for "doing . . . bad things" to her.

Eventually, Priyanka decided that Manish wanted "a nanny for his kids and somebody who could support his dream for his kids." In Priyanka's mind, Manish "just got [her] the green card and thought that [she] will be a slave to him . . . [who] will agree to everything he wants . . . and . . . will give him all the money" that she earns.

### b.    Rashmi Tiwari

Rashmi Tiwari testified that Priyanka, who was friends with Tiwari's roommate, stayed at her house for a few days in July 2015 after Priyanka had a fight with Manish. Tiwari said that Priyanka told her she did not want to divorce Manish until she obtained her green card.

### c.    Immigration law expert

Manish called Yemi Getachew to testify as an expert on immigration law. Getachew testified that "marriage to a United States citizen is the quickest path to U.S. citizenship." As a result, United States immigration officials "take[] it very seriously and . . . scrutinize[] cases at various points to determine that [the] relationship is real." After the marriage occurs, the immigration officer conducts an in-person interview with

the couple to confirm whether their "relationship exists and is real" and whether there is any reason to find that the foreign national "should be declared inadmissible." If "there's any indication to the [immigration] officer that there are any problems in the marriage at all, the . . . officer must deny and will deny the application" for a green card.

Getachew testified that the immigration officer would look for documents to demonstrate that the marriage was genuine, such as joint bank accounts, joint insurance, joint mortgage or other debt. The trial court clarified that one of the factors an immigration officer would consider in deciding if the marriage was bona fide is whether the couple continued to have sexual relations. On cross-examination, Getachew said that, in deciding whether a marriage is bona fide, there are multiple factors to be considered and no single factor is dispositive.

Getachew reviewed the records in this case and it appeared to her that the immigration officer was persuaded by the October 2014 interview that Manish and Priyanka had a bona fide marriage. However, she also testified that, because Priyanka was "out-of-status" by virtue of leaving her employment at the end of July 2013, her only pathway for her to become a citizen was through marriage. According to Getachew, even if the marriage fails, the foreign national could still obtain a green card by establishing that they entered the marriage in good faith, but it failed through no fault of their own, or they were subjected to extreme cruelty and battery by the citizen spouse.[13]

### c. *Shalini Bhatnagar*

Shalini Bhatnagar testified she spoke with Priyanka often during her marriage to Manish and Priyanka told her she left the United States in October 2013 because she was

_____

[13] Near the conclusion of Getachew's testimony, the trial court imposed strict time limits on the parties as there was "an hour and fifteen minutes left for this hearing." The trial court indicated it had not yet heard Manish's testimony, so it allocated 15 minutes to that portion of the hearing, leaving an hour to hear Priyanka's request for a DVRO. The trial court explained that "we had a day set aside for this and I'm not going to carry this over."

unable to find employment. Priyanka never told Bhatnagar that Manish was abusive to her or hit her. Bhatnagar said Priyanka told her she got upset with Manish, "hit [him] twice" and had to move out so it would not happen again as she "cannot control" herself.

### d. Manish's testimony

Manish testified that he met Priyanka in August 2013. He understood she was unemployed and was looking for a new job to transfer her work visa. They were "joking" about getting married prior to him initially proposing to her. Manish understood that Priyanka wanted to remain in the United States and have a career.

Manish now believes that she "defrauded" him and the "whole marriage was a scam just to get a green card." Before applying for the fiancée visa, Manish told her about his children from a prior marriage and Priyanka told him about her "problems with [her] immigration status" as well as an arrest on her record. He decided to proceed with the marriage because he "did love her a lot."

Because the immigration officer would look at commingling of assets, Manish added Priyanka to his checking account, but she never added his name to her accounts. He also said that she never changed her name on her social media accounts. Manish denied ever threatening to divorce Priyanka but said she was "the one who threatened to divorce me all the time."

On cross-examination, Manish said that he has made social media posts accusing Priyanka of committing marriage fraud in order to obtain citizenship and employment in the United States. However, he has also made posts professing his continued love for Priyanka and expressing a desire that she return to him.

In response to the trial court's question, Manish confirmed that, during the 16 months he and Priyanka were together, there were "good times as well as bad times." He also confirmed that they had "plenty" of consensual sex during that time period, and the last time they had sex was in December 2015, following their separation.

### e. Trial court's ruling

At the conclusion of the hearing, the trial court denied the petition for nullity, finding that Manish had failed to prove, by clear and convincing evidence, that his consent to the marriage was obtained by fraud. The trial court said, "this marriage . . . was not a black-and-white situation where we have a woman . . . marrying solely—or even primarily—for the purpose of visa fraud. [¶] . . . [T]here were visa applications[,] . . . [which] may have played some indeterminate role. But I think that this was a nuance [*sic*] marriage." In support of its finding, the trial court noted Manish's admissions that the marriage had "good times and bad times," that the parties engaged in consensual sex, both during the marriage and at least once after separating, and that there was some mingling of finances. The trial court also pointed out that Manish and Priyanka, just two months after Priyanka briefly considered seeking an annulment, persuaded the immigration officer that the marriage was bona fide.

### 2. Applicable legal standards and analysis

Manish argues the trial court utilized the wrong standard of proof in evaluating his petition to nullify the marriage. The trial court required that Manish prove his case by clear and convincing evidence even though the California Supreme Court has held that fraud need only be proved by a preponderance of the evidence. We disagree.

Section 2210, subdivision (d) provides a marriage may be annulled when "[t]he consent of either party was obtained by fraud, unless the party whose consent was obtained by fraud afterwards, with full knowledge of the facts constituting the fraud, freely cohabited with the other as his or her spouse." " 'A marriage may be annulled for fraud only in an extreme case where the particular fraud goes to the very essence of the marriage relation.' " (*In re Marriage of Goodwin-Mitchell & Mitchell* (2019) 40 Cal.App.5th 232, 238 (*Mitchell*).) "A concealed intent to marry solely to obtain favorable immigration status will also support annulment." (*Ibid*.)

21

In *Liodas v. Sahadi* (1977) 19 Cal.3d 278, the California Supreme Court, after noting there was division among the Courts of Appeal on the appropriate standard of proof in civil actions in which fraud is alleged, cited and discussed a number of its own prior decisions which "should have laid to rest the early belief that civil fraud must be proved by more than a preponderance of the evidence." (*Id*. at p. 289.) The Supreme Court also noted that "the matter is now governed by Evidence Code section 115, . . . which declares in relevant part that 'Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence.' " (*Id*. at p. 290.)

However, this rule is not as inflexible as Manish would have us believe. In *Weiner v. Fleischman* (1991) 54 Cal.3d 476, the California Supreme Court explained that when determining the proper standard of proof to apply " '[l]aw,' as referenced in [Evidence Code] section 115, includes 'constitutional, statutory, and decisional law.' (Evid. Code, § 160.)" (*Id*. at p. 483.) Accordingly, the trial court must inquire "whether constitutional, statutory or decisional law (i.e., case law) requires a burden of proof higher than preponderance of the evidence." (*Ibid*.) To that end, "[p]roof by clear and convincing evidence is required 'where particularly important individual interests or rights are at stake,' such as the termination of parental rights, involuntary commitment, and deportation." (*Id*. at p. 487.) We now examine whether annulment based on an allegation of fraud implicates such important interests or rights. As it happens, a long line of cases holds that it does.

"It has long been the rule that because of its peculiar position as a silent but active party in annulment proceedings the state is particularly interested in seeing that no marriage is declared void as the result of fraud unless the evidence in support thereof is both clear and convincing. Thus it has been said: 'The state has a rightful and legitimate concern with the marital status of the parties to the action, . . . and the fraud relied upon to secure a termination of the existing status must be such fraud as directly affects the marriage relationship and not merely such fraud as would be sufficient to rescind an

22

ordinary civil contract.' (*Bing Gee v. Chan Lai Young Gee*, 89 Cal.App.2d 877, 885; see also *Mayer* v. *Mayer*, 207 Cal. 685.)" (*Williams v. Williams* (1960) 178 Cal.App.2d 522, 525.) "Because public policy strongly favors marriage, the fraud must be shown by clear and convincing evidence." (*Mitchell*, *supra*, 40 Cal.App.5th at p. 238.)

Accordingly, the trial court properly required Manish to show fraud by clear and convincing evidence in order to prevail on his petition for nullity. We now turn to whether the trial court's factual determination was supported by substantial evidence. (See *Mitchell*, *supra*, 40 Cal.App.5th at p. 238 [substantial evidence review applies in an appeal from a judgment required to be based on clear and convincing evidence].)

Manish contends substantial evidence does not support the trial court's finding that there was not clear and convincing evidence of fraud. This argument goes to the weight of the evidence, which was for the trial court to assess. (*In re Marriage of Liu* (1987) 197 Cal.App.3d 143, 156.) The court based its decision on several of Manish's admissions, e.g., that there was some mingling of the parties' finances, that there were "good times and bad times" in the marriage, and that the parties engaged in consensual sex, not just during the marriage but at least on one occasion *after* separating. In addition, the trial court took note of the fact that, even after Priyanka admitted that she considered seeking an annulment in August 2014, both she and Manish were able to persuade the immigration officer in October 2014 that the marriage was bona fide.

Based on the evidence presented, the trial court found that, though Priyanka's immigration status "may have played some indeterminate role" in the marriage, it was not enough to establish fraud " 'go[ing] to the very essence of the marriage relation.' " (*Mitchell*, *supra*, 40 Cal.App.5th at p. 238.) "Although there was conflicting evidence presented at trial, we are bound by the trial court's interpretation of the facts." (*In re Marriage of Liu*, *supra*, 197 Cal.App.3d at p. 156.) Accordingly, we find that the trial court properly denied Manish's petition for nullity.

23

**III.    DISPOSITION**

The order granting Priyanka's petition for a DVRO is affirmed (H045092).

The order rescinding the March 8, 2017 award of attorney fees in favor of Manish is reversed (H045203).

The order denying Manish's petition for nullity is affirmed (H046567).

Priyanka shall recover her costs on appeal in H045092 and H046567.

The parties shall bear their own costs on appeal in H045203.

_____

                                    Premo, Acting P.J.

WE CONCUR:

_____

        Elia, J.

_____

        Bamattre-Manoukian, J.

Marriage of Ankola
H045092, H045203, H046567

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 115-FL173072 |
|---|---|
| Trial Judge: | Hon. James E. Towery |
| Counsel for Appellant:<br>Manishkumar Ankola<br><br>**Case Nos. H045092 & H045203** | Law Offices of Adam R. Bernstein<br>Adam R. Bernstein |
| Counsel for Appellant:<br>Manishkumar Ankola<br><br>**Case No. H046567** | Brian Beckwith |
| Counsel for Respondent:<br>Priyanka Ankola<br><br>**Case Nos. H045092, H045203,<br>H046567** | Law Offices of Peter A. Lindstrom<br>Peter A. Lindstrom |

Marriage of Ankola
H045092, H045203, H046567